MIDDLE EAST TRADING & MARINE SERVICE, INC., Plaintiff-Appellee, *v.* MERCANTILE FINANCIAL CORPORATION, Defendant-Appellant.

First District (3rd Division)   No. 62903

Opinion filed April 20, 1977.—Rehearing denied June 9, 1977.

Schwartz, Cooper, Kolb & Gaynor, Chartered, of Chicago (Narcisse A. Brown, Martin W. Salzman, and Ira S. Kolb, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Edward J. Zulkey, and Michael L. Coleman, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Middle East Trading & Marine Service, Inc. (Middle East), brought an action upon its option agreement for the purchase of an oceangoing vessel from defendant, Mercantile Financial Corporation (Mercantile). Count I of the amended complaint alleged breach of contract, and count II alleged unjust enrichment. The option agreement was executed and was to be performed in the State of Louisiana. After a trial without jury, judgment was awarded on June 27, 1975, in favor of Middle East and against Mercantile on count I for $98,975; and, in the alternative, on count II for $86,984.66. On appeal Mercantile contends that Middle East is not entitled to damages because upon the alleged breach of contract, Middle East failed to tender performance or otherwise put Mercantile in default, as allegedly required by Louisiana law; that Mercantile was excused from performance under the contract by reason of impossibility caused by Middle East; that the judgment for unjust enrichment is without legal basis; and that Middle East's recovery, if any, is limited to an out-of-pocket amount. We modify the amount and affirm the judgment of the trial court on count I. We do not reach the issue of unjust enrichment as to count II. The pertinent facts follow.

On January 14, 1970, Middle East, a Panamanian corporation with offices in Beirut, Lebanon, and Mercantile, a Delaware corporation with offices in New Orleans and Chicago, entered into an option agreement in New Orleans for the sale of an oceangoing tug, the *Lee Reuben*, then located in New Orleans. Under the terms of the agreement, the purchaser, Middle East, or its nominee was granted an exclusive option to purchase the vessel on or before July 7, 1970, for the sum of $316,025. Upon exercise of the option, credit against the purchase price was to be given for $35,000 previously paid to Mercantile, and also for sums paid by Middle East according to the schedule set forth in the agreement. The schedule provided for payments, until the option was exercised, of $5000 each on January 15, February 1, February 15, March 1, April 1, May 1, June 1 and July 1, 1970. Failure to make any payment within two days after the due date would result in termination of the agreement and forfeiture of sums paid thereunder, and of the $35,000 previously paid. To exercise its option, Middle East was to notify Mercantile by certified letter. Mercantile was then to deliver the act of sale[1] within two days after receipt of the letter, at which time Middle East was to deliver and pay the full amount due.

Also on January 14, 1970, an agreement was executed between Mercantile and Crown Well Service, Inc. (Crown Well), a corporation which the testimony disclosed had been acquired by the principals of

---

[1] An act of sale is an official record of a sale of property under Louisiana law. *Hodge v. Palms* (6th Cir. 1902), 117 F. 396.

Middle East. The agreement provided that in consideration of granting Middle East the aforementioned option to purchase, Crown Well released Mercantile of its obligations under an earlier option agreement. Crown Well also thereby released in Mercantile's favor, and for Middle East, the sum of $35,000 previously paid to Mercantile by Crown Well, which "constitutes the $35,000 credit granted to Middle East" in its option agreement with Mercantile.

On May 25, 1970, Middle East and Syrian Trading & Development Center (Syrian), a Lebanese corporation, entered into an agreement whereby Middle East agreed to exercise its option to purchase the vessel in favor of Syrian, and Syrian agreed to pay Middle East $350,000 upon delivery of the title documents.

After a total of $30,000 was paid by Middle East directly to Mercantile according to schedule in the option agreement, Middle East notified Mercantile by certified letter dated May 28, 1970, that it wished to exercise the option in favor of Syrian. Middle East also therein notified Mercantile that it had learned that Mercantile was not the owner of record of the vessel, that it assumed Mercantile could transfer title, and that it assumed that Mercantile would be in a position to comply with all applicable laws of the United States.

In a certified letter dated May 29, 1970, Middle East requested that Mercantile produce evidence of approval pursuant to "Section 88 [sic] of Title 46 [of the] United States Code, [which] provides that a sale or agreement to sell a vessel owned in whole or in part by citizens of the United States and documented under the laws of the United States to any person who is not a citizen of the United States, without the approval of the Secretary of Commerce, is unlawful." See 46 U.S.C. §808 (1965).

On the afternoon of June 2, 1970, the parties to the option agreement met at the United States Coast Guard Office pursuant to Mercantile's notice that it would be prepared to deliver title to the vessel, and that the "pay-off" figure was $268,580.74. Neither title nor purchase price was then or thereafter transferred between the parties.

On June 2, Mercantile telegraphed Middle East that at the June 2 meeting Mercantile had tendered in accordance with the option agreement, and that Middle East had refused to meet the option price; and further, that if the option price was not received by 10 a.m. on June 3, Mercantile would consider Middle East in default. Middle East then telegraphed Mercantile that it was Mercantile's obligation to provide good title for the vessel, to satisfy all liens, and to obtain governmental clearance for the sale to the nominee; and further, that if Mercantile failed to perform these obligations by 5 p.m. on June 3, Middle East would hold Mercantile in default. By letter dated June 3, Middle East notified Mercantile that Mercantile was in default, and demanded return of all

payments and credits received by Mercantile pursuant to the option agreement, together with interest and compensation for damages.

On June 3, Mercantile by letter offered to deliver to Middle East a bill of sale for the vessel. The letter further stated that since Mercantile had not been furnished with information necessary for application to the Maritime Administration of the Department of Commerce, the bill of sale would be made subject to approval by the Maritime Administration.

On June 4, Middle East supplied Mercantile with additional information concerning Syrian, stating that it was Syrian's intention to register the vessel in Latikia, Syria. The letter containing the information stated that the information was sent in response to Mercantile's request, and that Middle East still considered Mercantile in default. In another letter dated June 4, Middle East rejected Mercantile's June 3 offer of a bill of sale subject to subsequent governmental approval, again stating that Mercantile was in default under the January 14 agreement.

On June 14, the Department of State denied Mercantile's request for a munitions control license, stating that current policy prohibited such a transaction insofar as Syria had broken diplomatic relations with the United States.

On June 20, Mercantile telegraphed Middle East that since the Department of State denied Mercantile's request for a munitions control license, it was impossible to obtain approval from the Maritime Administration to place the vessel in Syrian's name; therefore Mercantile demanded that Middle East continue its option payments immediately, or Mercantile would consider the option payments previously made as forfeited. No further payments were made by Middle East.

On December 7, 1970, the *Lee Reuben* was sold by Mercantile in New Orleans to Escanaba Towing Company, Inc., for $334,480.

Middle East filed the instant suit against Mercantile on March 30, 1972. The amended complaint alleged that the construction and validity of the agreement was to be governed by Louisiana law, which allegation Mercantile admitted in its answer. The trial court on June 27, 1975, entered judgment for Middle East for $98,975 on count I, and in its written order then stated:

> "As to Count II of the Amended Complaint, the Court would preface its finding with a statement of recognition that the plaintiff may not recover both under the legal theory of breach of contract in Count I and the equitable theory of Unjust Enrichment in Count II. However, the Court also recognizes that a case of this complexity presents a strong potential for appeal. Consequently, the Court feels that the interest of judicial economy and expediency dictate that the Court make an alternative finding and judgment on Count II of the Amended Complaint so that the

necessity for a retrial of the cause might possibly be avoided in the event of appellate action inconsistent with this Court's judgment as to Count I."

The trial court then entered judgment on count II for $86,984.66, being the $65,000 paid under the option agreement with interest of 6 percent per annum since June 2, 1970.

## I.

Count I of the amended complaint alleged that Mercantile breached its agreement by failing to deliver the act of sale for the vessel in accordance with the terms of the agreement. Mercantile, however, argues that Middle East cannot recover because it did not put Mercantile in default as allegedly required by Louisiana law; that is, to warn Mercantile that the time to perform has come.

Under the option agreement, which provided for its exercise by Middle East in its own behalf or in favor of its nominee, notification of a desire to exercise the option was to be given to Mercantile by certified letter. It further provided that the act of sale shall be passed within two days after receipt of the certified letter, at which time the purchase price was to be delivered. After Middle East sent its notice by certified letter dated May 28, a "closing" was arranged by Mercantile for June 2. At that meeting neither title nor purchase price was transferred, and telegrams were thereafter exchanged by the parties stating that at a given time each would consider the other in default for nonperformance under the terms of the option agreement. On June 3, Middle East notified Mercantile by letter that Mercantile was in default because "there is no clear title [to] the vessel * * * and its sale has not been duly approved by the Maritime Administration * * *."

Under the agreement between Middle East and Mercantile, the balance of the purchase price and the act of sale were to be transferred either at the same time or the one immediately following the other. This type of contract is termed a "commutative contract" under Louisiana law; that is, one involving reciprocal obligations. La. Civil Code Ann. art. 1768 (West 1952).

Article 1913 of the Louisiana Civil Code provides:

> "Art. 1913. In commutative contracts, where the reciprocal obligations are to be performed at the same time, or the one immediately after the other, the party who wishes to put the other in default, must, at the time and place expressed in, or implied by the agreement, offer or perform, as the contract requires, that which on his part was to be performed, otherwise the opposite party will not be legally put in default." (La. Civil Code Ann. art. 1913 (West 1952).)

However, article 1931 of the Louisiana Civil Code provides:

"Art. 1931. A contract may be violated, either actively by doing something inconsistent with the obligation it has proposed or passively by not doing what was covenanted to be done, or not doing it at the time, or in the manner stipulated or implied from the nature of the contract." La. Civil Code Ann. art. 1931 (West 1952).

Under article 1933 of the Code, when the breach has been passive, damages are due from the time the obligor has been put in default. (La. Civil Code Ann. art. 1933 (West 1952).) However, under article 1932 of the Code, when there has been an active violation of a contract, the obligee is under no obligation to put the obligor in default in order to entitle him to recovery. (La. Civil Code Ann. art. 1932 (West 1952).) It has been stated that the reason why a putting in default is not necessary where there has been an active breach is that the law will not require a vain and useless thing of the obligee. *Elliot v. Dupuy* (1961), 242 La. 173, 135 So.2d 54; *Friedman Iron & Supply Co. v. J.B. Beaird Co.* (1953), 222 L. 627, 63 So.2d 144.

In the case at bar, Mercantile was under a contractual duty to pass the act of sale within two days after receipt of Middle East's certified letter. The option agreement did not provide any conditions under which the sale could be made subject to subsequent approval by the Maritime Administration, even though the testimony at trial shows that Mercantile was aware at the time it drafted the agreement that such approval was required in a foreign sale and that Middle East was a foreign corporation. Moreover, as a general principle of law, contracting parties are presumed to have contracted with knowledge of the existing law. (*Dantoni v. Board of Levee Commissioners* (1955), 227 La. 575, 80 So.2d 81; *Johnson v. Anderson-Dunham Concrete Co.* (1947), 212 La. 276, 31 So.2d 797.) Mercantile is therefore charged with knowledge upon execution of the contract that such approval may be necessary. In its attempt to transfer title subject to subsequent governmental approval, Mercantile acted inconsistently with its obligations under the option agreement and thereby actively breached its contract. Under these circumstances it was unnecessary for Middle East to put Mercantile in default.

## II.

Mercantile also argues that it was excused from performance under the agreement because performance became impossible due to Middle East's selection of a nominee to whom Mercantile could not have transferred the act of sale. Mercantile further contends that Middle East could have completed the transaction by taking title in its own name. Middle East, however, argues that Mercantile contracted in the face of the contemplated risk of governmental disapproval.

Article 1933 of the Louisiana Civil Code provides in pertinent part:

"2. Where, by a fortuitous event or irresistible force, the debtor is hindered from giving or doing what he has contracted to give or do or is from the same causes compelled to do what the contract bound him not to do, no damages can be recovered for the inexecution of the contract."

3. There are two exceptions to the last rule: first, when the party in default has by his contract expressly or impliedly undertaken the risk of the fortuitous event, or of the irresistible force; secondly, if the fortuitous event, or case of force, was preceded by some fault of the debtor, without which the loss would not have happened."

La. Civil Code Ann. art. 1933 (West 1952).

It is clear that an obligor under a contract cannot negotiate in the face of a known risk and, upon the occurrence of that risk, plead its occurrence as an excuse for non-performance of its contractual obligation. (*Harper v. Home Indemnity Co.* (La. App. 1962), 140 So.2d 653; *Cook & Laurie Contracting Co. v. Denis* (1909), 124 La. 161, 49 So. 1014.) In the case at bar, the attorney who represented Mercantile at the time that the option agreement between Middle East and Mercantile was executed testified at trial that he drafted the instrument, that he knew that Middle East was a Panamanian corporation with offices in Beirut, that the agreement contained an unrestricted option to name any nominee for the purchase of the vessel, that at the time the option agreement was executed he knew that approval of the Maritime Administration was required for the transfer of a vessel to a foreign national, but that at the time no inquiry had been made on behalf of Mercantile into any laws or regulations of the United States.

We find that the risk of disapproval was an event, contingency or force well within the contemplation of Mercantile at the time of execution of the contract, and against which it could have protected itself. It is not, therefore, an event which excuses Mercantile from its obligations under the agreement.

### III.

Finally, Mercantile contends that Middle East's recovery, if any, is limited to $30,000, the amount which Middle East paid directly to Mercantile under the schedule in the option agreement, and not $98,975 awarded by the trial court.

The judgment order awarded Middle East $98,975 on count I, stating "said sum being the total of the monies paid by plaintiff under the option agreement and its lost profit under its contract for resale of the vessel."

It was stipulated between the parties that Middle East paid $30,000 directly to Mercantile under the schedule set forth in the agreement.

Pursuant to the option agreement and an agreement between Mercantile and Crown Well, Mercantile granted Middle East a $35,000 credit for "sums previously paid" to Mercantile. Thus, the sum of $65,000 is due Middle East for monies paid under the option agreement.

Middle East claims that upon breach of the option agreement it was also entitled to recovery from Mercantile additional damages of $33,975 for lost profit. The amount represents the difference between the purchase price of $316,025 under its option agreement with Mercantile, and the sale price of $350,000 which Syrian agreed to pay for the vessel to Middle East.

Article 1934 of the Louisiana Civil Code provides in pertinent part:

> "Art. 1934. Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
>
> 1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract * * *." La. Civil Code Ann. art. 1934 (West, 1952).

■■ ■ Middle East maintains that upon execution of the option agreement Mercantile could have reasonably contemplated that its breach might deprive Middle East of a profit, since the agreement granted an exclusive option to purchase to Middle East "or its nominee." Other than its use relative to a candidate for office, the word "nominee" as commonly used connotes "the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in or ownership of the rights of the person nominating him." (*Cisco v. Van Lew* (1943), 60 Cal. App. 2d 575, 583-84, 141 P.2d 433, 438.) The inclusion of the phrase "or its nominee" in the option agreement was insufficient in itself to indicate that the alleged lost profits were contemplated, or could reasonably be supposed to have been in the contemplation of the parties at the time of the agreement, as damages in the event of a breach by Mercantile. We conclude that Middle East is not entitled to recover damages for the alleged lost profits and that the trial court's award of damages in excess of $65,000 is not supported by the evidence. Therefore, the judgment entered on count I must be modified accordingly.

## IV.

The judgment of the trial court on count II was expressly contingent upon our reversal of the judgment as to count I. Inasmuch as we affirm

the latter judgment as modified, we vacate the judgment entered on Count II and do not reach the remaining contentions on appeal.

## V.

Therefore, pursuant to Supreme Court Rule 615 (b) (1) (Ill. Rev. Stat. 1973, ch. 110A, par. 615 (b) (1)), the judgment of the circuit court of Cook County entered June 27, 1975, in favor of Middle East and against Mercantile on Count I for $98,975 is reduced and modified to $65,000, and as modified is affirmed. The judgment entered on count II is vacated.

Judgment on count I affirmed as modified.
Judgment on count II vacated.

McNAMARA and McGLOON, JJ., concur.